Beverly PITAK, Philip Polchinski, Jerry Rodda, Nancy Scholz, Gloria Nobles, Terence Juliano, Romilda Vaccarella, Plaintiffs,

v.

BELL ATLANTIC NETWORK SVCS., INC., Bell Atlantic Corp., "John Doe, Inc.," Ralph Szygenda, individually and as an employee of the defendant, Bell Atlantic Network Svcs., Inc., and/or "John Doe, Inc.," Raymond Smith, individually and as chief executive officer and chairman of the defendant, Bell Atlantic Corp., John Gamba, individually and as an employee of defendant, Bell Atlantic Corp., Defendants.

Civil Action No. 95–3319 (AJL).

United States District Court,
D. New Jersey.

May 8, 1996.

Arthur G. Nevins, Jersey City, New Jersey, for Plaintiffs.

Francis X. Dee, David J. Reilly, David B. Beal, Carpenter, Bennett & Morrissey, Newark, New Jersey, for Defendants.

## OPINION

LECHNER, District Judge.

This is an action by Beverly Pitak ("Pitak"), Philip Polchinski ("Polchinski"), Jerry Rodda ("Rodda"), Nancy Scholz ("Scholz"), Gloria Nobles ("Nobles"), Terence Juliano ("Juliano") and Romilda Vaccarella ("Vaccarella") (collectively, the "Plaintiffs"), against Bell Atlantic Network Services, Inc. ("BANS"), Bell Atlantic Corporation ("BAC"), Raymond Smith ("Smith"), individually and as chief executive officer and chairman of BAC, Ralph Szygenda ("Szygenda"), individually and as an employee of BANS and John Gamba ("Gamba"), individually and as an employee of BAC (collectively, the "Defendants"). Federal question jurisdiction and supplemental jurisdiction are asserted. Diversity jurisdiction is not alleged.

Currently before the court is a motion for partial summary judgment filed by the Defendants (the "Motion for Partial Summary Judgment"), pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, with respect to the first, second, fourth, fifth and eighth counts of the complaint ("Complaint") as to all Defendants, and for summary judgment as to all counts of the Complaint with respect to Szygenda, Gamba and Smith.[1] For the reasons set forth below, the Motion for Partial Summary Judgment is granted.

*Facts*

A. *Parties*

The Complaint alleges each of the Plaintiffs, who are between the ages of forty and fifty-four, reside in New Jersey. Complaint, ¶¶ 1–7. BANS employed each of the Plaintiffs in its Madison, New Jersey facility, for periods ranging from twelve to twenty-nine years. *Id.;* Plaintiffs' Rule 12G Statement at 1. Plaintiffs were data programmers or ana-

1. Plaintiffs submitted: Plaintiffs' Brief and R. 12(G) Statement in Opposition to Defendants' Motion for Partial Summary Judgment ("Plaintiffs' Rule 12G Statement") ("Opposition Brief"); Certification of Arthur G. Nevins, Jr., in Opposition to Defendants' Motion for Partial Summary Judgment attaching exhibits.

Defendants submitted: Defendants' Memorandum of Law and Rule 12.G Statement in Support of Motion for Partial Summary Judgment ("Defendants' Rule 12G Statement"); Defendants'

Reply Memorandum of Law in Further Support of Motion for Partial Summary Judgment; Affidavit of David J. Reilly in Support of Motion for Partial Summary Judgment ("Reilly Aff.") attaching exhibits; Supplemental Affidavit of David Reilly in Further Support of Motion for Partial Summary Judgment attaching exhibits.

The exhibits to the submissions include transcripts of depositions with various individuals, which are cited as: [name] Dep. at [page].

lysts assigned to work on a standardized billing system, known as the Customer Records Information System ("CRIS") (the "CRIS Standardization"). Defendants' Rule 12G Statement at 2. Each Plaintiff was terminated, by letter, dated 29 March 1994, as part of a reduction in force ("RIF"). Plaintiffs' Rule 12G Statement at 1.

Plaintiffs do not allege the domicile of BAC or BANS; they allege each is licensed to do business in the State of New Jersey and also allege BAC is the corporate parent of BANS. Complaint, ¶¶ 8–9, 11. Szygenda was allegedly vice-president of information systems for BAC and BANS. *Id.,* ¶ 12. Smith was allegedly the chief executive officer and chairman of BAC during the time relevant to the Complaint. *Id.,* ¶ 13. During that time, Gamba was allegedly the vice-president of BAC for corporate and human resources. *Id.,* ¶ 14.

The submissions refer to other individuals. James Cleary ("Cleary"), a member of management employed by BANS, worked in Madison, New Jersey through 31 January 1995. Cleary Dep. at 13. Cleary was then a member of the "third level of management [ ("Third Level Managers") ];" Plaintiffs were then members of the "first level of management [ ("First Level Managers") ]." Third Level Managers supervise First Level Managers. *Id.* at 16–17. Cleary reported directly to Paul MacGuire, then to Bryan Parish and, from late 1993 through late 1994, to David Swan ("Swan"). Swan then held the title of "[a]ssistant vice-president, standardization." *Id.* at 18–19. In March 1993, Swan appointed Eugene O'Mullan ("O'Mullan") to be Resource Redeployment Director. Plaintiffs' Rule 12G Statement at 9.

B. *Background*

1. *CRIS Standardization* [2]

"At the time of the AT & T divestiture in 1984, New Jersey Bell, Bell of Pennsylvania and the C & P Companies each had different systems for billing customers." Defendants' Rule 12G Statement at 3. "The purpose of CRIS Standardization was to convert New

Jersey and C & P to the Pennsylvania System, a multi-phase system which started in approximately 1988." *Id.* At the time CRIS Standardization began, Bell of Pennsylvania, which had the most modern of the systems in use at the time of the AT & T divestiture, was "selected as the base line system." Swan Dep. at 49. CRIS Standardization was scheduled for completion in January 1994, and between 16 January and 29 March 1994, [sixty percent] of the New Jersey billing system became standardized." Plaintiff's Rule 12G Statement at 6 (citing Cleary Dep. at 45–46; Swan Dep. at 51). "The New Jersey phase of the project was known as CRIS–New Jersey." Defendants' Rule 12G Statement at 3 (citing Swan Dep. at 48–50). Upon completion of CRIS Standardization, a new billing system, first named "BACUS" and later renamed "Express Track," would be implemented. Swan Dep. at 50.

2. *Promises and Assurances of Continued Employment*

"Plaintiffs all claim that they were made promises and assurances of continued employment." Plaintiffs' Rule 12G Statement at 2. Plaintiffs allege Defendants "intentionally and knowingly made false representations, assurances, promises and commitments to the [P]laintiffs ... with the encouragement and instigation" of Smith, Gamba and Szygenda, "in spite of the knowledge that these assurances were untrue and calculated to induce [P]laintiffs to remain in their positions until [CRIS Standardization] was completed and they could be terminated." Complaint, ¶ 33. "While it was understood that [CRIS Standardization] ... would, once successfully implemented, lead to the reduction of some CRIS job positions in Madison, New Jersey, the [P]laintiffs were promised that they would be given new assignments within [BANS] or [BAC]." *Id.,* ¶ 22; *see* Plaintiffs' Rule 12G Statement at 3 ("It is undisputed that the five [P]laintiffs working on CRIS in Madison, New Jersey knew that upon standardization, their positions would likely be

---

**2.** "Plaintiffs concede the correctness of [Defendants' Rule 12G Statement] as to CRIS." Plain- tiffs Rule 12G Statement at 2.

eliminated."). A summary of facts that form the basis for the Plaintiffs' claims follows.

### a. *Alleged Statements of Cleary*

"At one point or another everyone in Madison reported to [Cleary]." Cleary Dep. at 14. Cleary states that, beginning in late 1992 or early 1993, while at Madison, First Level Managers, which included Plaintiffs, expressed concerns regarding job security. *Id.* at 20–22. "They were concerned because most of the work seemed to be going to Philadelphia, and they were concerned what would happen to them." *Id.* at 20. Cleary suggests these concerns, "a constant topic of conversation," approached the level of a morale problem. *Id.* at 22–23. Cleary conveyed his observations to Swan, *id.* at 23, and also responded to these concerns. *Id.* at 26–27 ("My favorite term at the time was this is not a pink slip company."); *id.* at 27 ("[T]his was not the kind of company who would let people go for helping accomplish a major mission of the company."); *id.* at 31–32 ("I basically told them that they really needed to work very closely with their managers to make sure that they had their skills inventory, data base updated, to let people know what their desires were. I always reminded them that they were responsible for their own career."); *id.* at 133–34 ("[T]his company is not at a loss for work.").

Cleary indicated he did not believe layoffs would follow from CRIS Standardization, and so indicated to First Level Managers. Cleary Dep. at 31–34. Cleary drew such conclusions based upon his opinion of "our culture.... In the 24 years I worked for the Bell System, except for the last year, we did not let people go for lack of work. We would retrain people. We would find suitable work. We would try to match skill sets. We did not have layoffs." *Id.* at 35; *id.* at 38 ("It was my assumption that all of us would stay with the company forever."); *id.* (Q: "And when you say 'forever,' you mean up until retirement?" A: "Yes."). Cleary states that, at a staff meeting, he

> told folks through [his] experiences with the company ... we all had or could have had, had the option to have stock in Bell Atlantic, that if they would avail themselves of the option and would follow some simple financial principles, they could leave the company with a million dollars.

*Id.* at 37–38. Cleary "assumed" surplus staff members following CRIS Standardization would be redeployed. *Id.* at 48. He had lists of people whose jobs were expected to be eliminated, along with information about their skills, and he reviewed this information with other members of management. *Id.* at 49–51. Managers who expected to have surplus employees following CRIS Standardization exchanged names with other members of management, a process Cleary characterized as "a round table...." *Id.* at 49. Some displaced employees were relocated. Plaintiffs were among the listed individuals who were not relocated. *Id.* at 51–52.

Some of the Plaintiffs state Cleary provided them with assurances. *See, e.g.,* Vaccarella Dep. at 34–35 ("Cleary ... assured us that there would be jobs for us, not to worry. Trust him. Trust Bell Atlantic. We would always have jobs."); Polchinski Dep. at 49–50 ("[Cleary] expressed satisfaction in the job that I was doing and said that there would always be a place for people who were willing to work for Bell Atlantic").

### b. *June 1992 Letter to Pitak and Scholz*

Pitak and Scholz each received a letter from their manager at BANS, dated 24 June 1992, providing in pertinent part:

> As you know with the advent of CRIS [S]tandardization the requirement for Bell Atlantic to maintain a CRIS work force here in Madison will be eliminated. At the end of 1991 I informed you that due to the needs of the business I could not release you to seek a new assignment outside the CRIS organization. However, I also committed to you at the time that [Cleary], then Director, Revenue Reports, and I would do all we could to assist you in seeking a new assignment, within Bell Atlantic, at the conclusion of the CRIS Standardization Project. The position regarding releasibility and the commitment we have made to you have been reviewed with Al Stackpole and he is in full support of both. This letter will serve as your written confirmation of our commitment.

Defendants' Rule 12G Statement at 5–6; *see* Plaintiffs' Rule 12G Statement at 12.

### c. *March 1993 Swan Meeting*

Swan states he appointed O'Mullan in early 1993 to supervise a transition planning effort. Swan Dep. at 122, 137. Polchinski states Swan held a meeting in March 1993 (the "Swan Meeting") after learning job security concerns had lowered morale in the CRIS Standardization group. Polchinski Dep. at 82–83. Polchinski states Swan "promised to create something and get back to us in the very near future so that we would feel confident that he was actually working on a gripe of ours." *Id.* at 83. Vaccarella states Swan then indicated "there would be reemployment by the company of anyone whose job was eliminated. The people were not being eliminated, merely the jobs." Vaccarella Dep. at 30. "[P]eople whose jobs were eliminated would be referred to [O'Mullan] for reemployment within Bell Atlantic Company. So there [was] no need for anyone to worry." *Id.* at 31–32.

### d. *Redeployment*

Plaintiffs allege Defendants mislead them "as late as 16 February 16, 1993" into believing they would be " 'redeployed to new development activities' " if they remained with BANS and aided in the CRIS–New Jersey transition. Complaint, ¶¶ 26–27. Plaintiffs also indicate they relied upon Swan's previous redeployment of other employees related to CRIS, known as the TOLLS group ("TOLLS"). Plaintiffs' Rule 12G Statement at 14. Plaintiffs represent that, although many of the TOLLS positions were eliminated, all TOLLS employees were redeployed and none was terminated. *Id.; see* Cleary Dep. at 47 (observing Swan had successfully redeployed all TOLLS employees).

### e. *Questionnaires*

Following the Swan Meeting, Plaintiffs received questionnaires inquiring of short and long term career goals and a description of what each employee would be doing to reach such goals. Reilly Aff., Ex. N. "While it is undisputed that none of the [P]laintiffs deemed the questionnaires in and of themselves as promises for employment, they were aware of the redeployment team's efforts and it's (sic) purpose to match them to new jobs within the company." Plaintiffs' Rule 12G Statement at 15. "Juliano assumed from the questionnaires that 'they were matching skills and jobs and where those jobs would be available.' " *Id.* (quoting Juliano Dep. at 63).

### f. *The 14 June 1993 Meeting*

The Complaint alleges Defendants required Plaintiffs to attend a meeting in Philadelphia on 14 June 1993 (the "14 June 1993 Meeting"). Complaint, ¶ 28. Plaintiffs allege that, at the 14 June 1993 Meeting, "they were again reassured . . . that they would all be redeployed within the corporations after their current task was finished and their current positions were eliminated." *Id.* Four of the Plaintiffs, Scholz, Polchinski, Pitak and Rodda, attended the 14 June 1993 Meeting, during which O'Mullan, "Swan's Redeployment Director, made a presentation on Redeployment." Plaintiffs' Rule 12G Statement at 15; Defendants' Rule 12G Statement at 8. Plaintiffs allege they relied on O'Mullan's representations at the 14 June 1993 Meeting by declining to seek or accept other employment. Complaint, ¶¶ 29–30.

### g. *Alleged Statements of Szygenda*

Szygenda held a "town meeting" in September 1993, in Madison, New Jersey, attended by all of the Plaintiffs. Plaintiffs' Rule 12G Statement at 17; Defendants Rule 12G Statement at 9. Rodda states Szygenda then indicated he had "no plans to eliminate us, terminate us." Rodda Dep. at 150. Four of the Plaintiffs state Szygenda indicated "at the immediate time [he, Szygenda] had no plans for downsizing." Defendants' Rule 12G Statement at 9 (citing Polchinski Dep. at 98; Nobles Dep. at 51; Rodda Dep. at 150; Vaccarella Dep. at 51). Szygenda also stated he previously closed or consolidated other data centers when employed by other firms. *Id.* (citing Nobles Dep. at 52).

### h. *25 January 1994 Newspaper Advertisement*

On 25 January 1994, shortly before Swan announced positions would be eliminated,

BAC placed an advertisement in the Newark Star–Ledger (the "Star–Ledger Announcement"), announcing:

> New Jersey Bell is Changing its Name to Bell Atlantic.
>
> (Some things, however, will remain the same.)

Reilly Aff., Ex. O. The remainder of the page below the header contained, in small print, the names of hundreds of BAC employees, including Vaccarella and Juliano. *Id.* Vaccarella states the advertisement prompted her to assume she would continue to hold her position. The following day, however, Swan announced, at a meeting (the "26 January 1994 Meeting"), that positions would be eliminated. Vaccarella Dep. at 38–40; *id.* at 40 ("We were told that a redeployment team was being set up, and those people whose jobs were being eliminated would be referred to the redeployment team to be retrained by the company in other positions"). Vaccarella stated Swan indicated at the 26 January 1994 Meeting, that although positions were to be eliminated, jobs would be nonetheless available, possibly in departments or locations other than in Madison, New Jersey. *Id.* at 40. Approximately eighty people attended the 26 January 1994 Meeting. *Id.* at 39.

i. *Alleged Statements of Other BANS Managers* [3]

Nobles states Barbara Helmich ("Helmich"), her director, indicated several times in meetings held prior to 1993 that " 'there would be plenty of jobs for everyone and there was no need to worry about security, job security, that there was more than enough work for all of us.' " Defendants' Rule 12G Statement at 10 (quoting Nobles Dep. at 36–37). Nobles states Helmich indicated "there would 'possibly be transfers, but as far as relocation money, she wasn't really sure of how much or if there would be any; that kind of thing.' " *Id.* at 10–11 (quoting Nobles Dep. at 43). As well, Helmich " 'didn't know exactly what [work] was going to be brought back in [to Madison].... [T]here was never a definitive yes, you will

work here....' " *Id.* at 11 (quoting Nobles Dep. at 43, 46).

Polchinski states several managers told him that BANS would " 'take care' of its employees after CRIS Standardization." Defendants' Rule 12G Statement at 11 (quoting Polchinski Dep. at 61). Scholz states she was assured prior to the end of 1991 that Cleary and Randy Pelton, another member of management, committed "to helping her out if it was necessary." *Id.* (citing Scholz Dep. at 65, 67). Scholz also states Carolyn Pelton, another member of management, stated in 1993 "that work was going to be brought back to New Jersey from Pennsylvania [and] asked us for any ideas as to what [work] could be brought back." *Id.* (citing Scholz Dep. at 77). Rodda states Wilson Parrin, a BANS assistant vice-president, was asked in the spring of 1993 "what the plan was for Madison," to which he responded " 'the plan, there is no plan.' " *Id.* at 12 (quoting Rodda Dep. at 122). Pitak states "Freem," a member of management, told her during a meeting in March or April 1992 that she was "not 'releasable' " and that she would " '[make] sure we were taken care of after the project was completed.' " *Id.* (quoting Pitak Dep. at 46). Vaccarella states Mary Lonero, a manager, stated to her that " 'there was nothing [she] should worry about' " with respect to the 26 January 1994 Meeting. *Id.* (quoting Vaccarella Dep. at 43). Juliano states he asked Kathy Freitag, a manager, at weekly meetings "about his status." " 'Her general response was she didn't know.' " *Id.* (quoting Juliano Dep. at 50). Juliano states he was told there might be positions open in Maryland but that he was not promised a job. *Id.* at 13 (citing Juliano Dep. at 64).

j. *Transfer Requests*

Some of the Plaintiffs allegedly requested transfers to other positions within BAC or BANS "and/or releases to work elsewhere," which allegedly were denied on the ground that "they were too invaluable to be reassigned or transferred." Complaint, ¶¶ 24–25. Plaintiffs indicate some of their peers were invited to transfer to facilities in Maryland.

**3.** Plaintiffs stipulate to Defendants' statement on this issue. Plaintiffs' Rule 12G Statement at 18.

Plaintiffs' Rule 12G Statement at 3. Juliano states he requested a transfer to the "Operations Technical Support" group, which was denied. Juliano Dep. at 68; *see* Cleary Dep. at 41 (indicating that many employees had applied for transfers and were told they were "unreleasable" or "untransferable").

### 3. *Reliance, or Lack Thereof*

Based upon "[D]efendants' continued representations of reassignment or redeployment within [BANS or BAC], the [P]laintiffs did not seek out or accept other positions of employment." Complaint, ¶ 30. Plaintiffs indicate they expected their positions in Madison would be eliminated and that some positions would be transferred to facilities in Maryland following CRIS Standardization. Plaintiffs' Rule 12G Statement at 3–4. Plaintiffs represent several employees at the Madison, New Jersey BANS facility had been transferred to Maryland. Juliano, who was given that opportunity in 1991, declined. *Id.* at 3. Vaccarella indicated she first became aware of the possibility that her job would be eliminated in January 1994, and "her manager told her she would not be affected." *Id.* at 4 (citing Vaccarella Dep. at 27, 43). Polchinski expressed concerns whether he would continue to have a job following completion of CRIS Standardization, and was "repeatedly told there was plenty of new work to be done, that [Plaintiffs] were going to fill in those newly-created positions that were going to open up after standardization was completed." Polchinski Dep. at 34.

Several of the Plaintiffs expressed concerns about job security. Plaintiffs' Rule 12G Statement at 4–5. Nobles "and her group were reassured 'monthly, there was always a reassuring of everyone because it was a major concern. . . .'" *Id.* (quoting Nobles Dep. at 39). "While rumors abounded, and common sense dictated that jobs would change once the billing transition was implemented, management continually assured the [P]laintiffs that their jobs with the company would be secure upon implementation of standardization." *Id.* at 5; *see* Cleary Dep. at 120 (explaining rumors to effect that "if you don't get [relocated] to Philadelphia you won't have a job in a couple of years").

"Each Plaintiff relied on the aforesaid promises and assurances, together with their knowledge and experiences of company history and culture, company dealings and experience, and each assumed they would have jobs 'until retirement.'" Plaintiffs' Rule 12G Statement at 18–19 (citing Cleary Dep. at 38); *see id.* at 19 (indicating Vaccarella relied upon statements by Cleary and O'Mullan and the Star–Ledger Announcement) (citing Vaccarella Dep. at 35, 38, 44–48); *id.* (indicating Nobles relied upon statements by Swan "that there would be jobs for every one" and also relied upon statements by Helmich and Charles Henry) (citing Nobles Dep. at 36–38, 77). Plaintiffs represent Polchinski, Rodda, Pitak and Scholz relied upon "repeated promises and assurances of Cleary, Swan, O'Mullan, . . . and the company history of not laying people off for lack of work." *Id.* (citing Cleary Dep. at 35). "Juliano relied upon what was told to him by his co-workers, and that work was being brought back to Madison." *Id.* at 20 (citing Juliano Dep. at 89).

During the period Plaintiffs were given such assurances, each sought other employment. BANS or BAC maintained a database, known as STAR ("STAR") with information concerning available employment positions. Defendants' Rule 12G Statement at 13 (citing Moore Dep. at 116). Plaintiffs used STAR to locate and apply for other positions. Pitak checked STAR once per month in 1992, once per week in 1993 and every other day in February 1994. *Id.* (citing Pitak Dep. at 79–80). Vaccarella applied for as many as 140 jobs between 1992 and 1994. *Id.* (citing Vaccarella Dep. at 61–62). Nobles used STAR to apply for more than one hundred jobs between 1992 and 1994. *Id.* (citing Nobles Dep. at 90–91, 187). Polchinski accessed STAR in 1994, *id.* (citing Polchinski Dep. at 151–55), Juliano may have used STAR between 1992–94, *id.* at 13–14 (citing Juliano Dep. at 77–78), Scholz used STAR in February and March 1994, *id.* at 14 (citing Scholz Dep. at 137–38) and Rodda used STAR in January or February 1994. *Id.* at 14 (citing Rodda Dep. at 88).

"Plaintiffs do not dispute that they made applications through [STAR]," although they

argue such applications should not be construed as lack of reliance on the statements of Defendants. Plaintiffs' Rule 12G Statement at 21. Rather, Plaintiffs argue their STAR applications are further evidence of reliance because "Cleary, Swan and O'Mullan all indicated [P]laintiffs should apply through STAR as part of the redeployment process." *Id.*

#### 4. *Alleged Contract Between BANS and Plaintiffs*

Defendants indicate Plaintiffs state they had no written contract with BANS. Defendants' Rule 12G Statement at 14 (citations omitted). "As the basis for their implied contract, the [P]laintiffs refer generally to the promises and assurances [previously described]." *Id.* The following is an excerpt from Rodda's deposition:

Q: Are you claiming there was a contract between you and Bell Atlantic?

A: Yes.

Q: Was that written down anywhere?

A: There was no written contract, but it was implied if I do my job, I was told this from day one, if I do my job, I would be employed. If I did my job the best I could, I would have a job forever until I retired or until I died. That was the Bell Atlantic way.

Rodda Dep. at 137; *see* Nobles Dep. at 161 (no written contract); Polchinski Dep. at 175–80 (same); Pitak Dep. at 101–03 (stating "[e]mployment papers she completed saying that [she] would be willing to work for New Jersey Bell, Bell Atlantic" at the time she was hired in 1971 formed basis for employment contract, although Pitak had no copy of the forms and did not know what termination provisions, if any, the forms contained).

Defendants represent Plaintiffs could not identify at their depositions any contractual provision specifying a particular job position or a specific salary to which he or she was contractually entitled. Defendants' Rule 12G Statement at 15 (citations omitted). Defendants quote the following passage from Juliano's deposition:

Q: Do you recall anyone at Bell Atlantic ever promising you that you would have a job?

A: I don't think so.

Q: Do you recall anyone at Bell Atlantic ever giving you an assurance that you would have a job?

A: I don't think so.

*Id.* (quoting Juliano Dep. at 66).

"Plaintiffs do not dispute the quotations [Defendants have] taken from their deposition testimony...." Plaintiffs' Rule 12G Statement at 22. Plaintiffs argue, as discussed below, that employment contracts can be inferred "from the words and actions of employees and managers," as summarized. *Id.*

#### 5. *Termination of Plaintiffs' Employment*

Plaintiffs allege Szygenda was responsible "for the overall implementation of the termination of the [P]laintiffs," Complaint, ¶ 31, alleging BAC, BANS, Smith and Gamba hired Szygenda "specifically to terminate [P]laintiffs' employment in direct contravention of the promises and commitments made to [P]laintiffs." *Id.,* ¶ 32; *see id.,* ¶ 36 (same). Plaintiffs represent Szygenda terminated a total of 291 employees as part of a RIF. Plaintiffs' Rule 12G Statement at 13.

Cleary states Defendants decided upon an RIF in October or November 1993. Cleary Dep. at 61. As indicated, Swan held the 26 January 1994 Meeting in Madison, New Jersey, at which he announced that positions would be eliminated and that employees, including Plaintiffs, should seek other work. Nobles states Swan indicated Defendants

were not going to bring work to the Madison area and that we should seek employment through [STAR] and if not, the ones that would remain—or we could voluntarily leave, and the ones that remained would be [subject to a RIF] and there was no date given as to the [RIF] date.

Nobles Dep. at 163. At the time of the 26 January 1994 Meeting, Defendants had not determined who would be subject to the RIF. Defendants' Rule 12G Statement at 16. The parties agree "[i]t is undisputed that the

Plaintiffs and others who attended this meeting were advised that positions would be eliminated." *Id.; accord* Plaintiffs' Rule 12G Statement at 22. Defendants made Plaintiffs aware of a voluntary termination program offering severance benefits. Moore Dep. at 63, 100.

Defendants represent they eliminated seventy-seven CRIS–New Jersey positions but were able to reassign to other positions all but eighteen individuals, including Plaintiffs. Defendants' Rule 12G Statement at 17 (citing Reilly Aff., Ex. L). By letters, dated 29 March 1994 (the "29 March 1994 Letters"), BANS terminated Plaintiffs, beginning 30 April 1994, providing them with separation agreements (the "Separation Agreements") to be returned within a period ranging from forty-five to sixty days of the termination date. *Id.;* Complaint, ¶¶ 17–18. Plaintiffs allege they were surprised to receive the 29 March 1994 Letters and did not execute the Separation Agreements [4] by the 27 May 1994 deadline because they "had each been promised that they would not be terminated, either verbally, by actions, or in writing, or a combination thereof...." *Id.,* ¶¶ 19–21. Plaintiffs allege they were terminated "on the basis of age and/or race, or because as older and more senior employees, they were more expensive and posed a greater risk of short and long term financial liability for the [D]efendants." *Id.,* ¶ 34.

### C. *The Complaint*

As indicated, diversity jurisdiction is not alleged. The Plaintiffs allege three Federal claims and seven state-law claims. Count one alleges Defendants are liable under a theory of promissory and equitable estoppel. Complaint, ¶¶ 37–40. Plaintiffs allege they were terminated in a manner "contrary to the public policy of the [S]tate of New Jersey" and that Defendants "intentionally and falsely" made representations on which the Plaintiffs relied to their detriment, thereby "result[ing] in discrimination by reason of age and race." *Id.,* ¶ 39.

Count two alleges Defendants are liable for common-law fraud. Complaint, ¶¶ 41–45. Plaintiffs allege Defendants "made representations, assurances, commitments and promises to the [P]laintiffs" on 16 February 1993 and 14 June 1993. *Id.,* ¶ 42. "These representations were knowingly and intentionally false and misleading and calculated to induce the [P]laintiffs to rely thereon." *Id.,* ¶ 43. Plaintiffs allege they relied to their detriment upon the assurances of the Defendants by deciding not to seek employment elsewhere. *Id.,* ¶ 44.

Count three alleges violations of 42 U.S.C. §§ 1985(3), 1986 and 1988. Complaint, ¶¶ 46–51. Plaintiffs allege Defendants conspired among themselves to deprive them "of their civil rights and their employment." *Id.,* ¶ 47. Specifically, the Plaintiffs allege Smith and Gamba hired Szygenda to implement a conspiracy to deprive the Plaintiffs of their right to employment. *Id.,* ¶ 48. Plaintiffs allege conduct by Smith, Gamba and Szygenda was committed with knowledge that the Plaintiffs would be injured, "was intentional, and/or was committed with reckless and wanton indifference to the rights of the [P]laintiffs, and with callous indifference to their rights not to be discriminated on (sic) based on age or race." *Id.,* ¶¶ 49–50.

The fourth count of the Complaint alleges Defendants are liable for tortious interference with contract. Complaint, ¶¶ 52–57. Plaintiffs allege Smith, Gamba and Szygenda knowingly made false and misleading promises and assurances to the Plaintiffs to induce them to continue working for the Defendants. *Id.,* ¶ 53. Plaintiffs allege, on information and belief, that such actions by Defendants constitutes tortious interference with "[P]laintiffs' employment rights with defendant [BANS]." *Id.,* ¶ 56.

The fifth count of the Complaint alleges Defendants are liable for breach of contract. Complaint, ¶¶ 58–64. Plaintiffs allege actions by the Defendants, including promises of continued employment and refusal to permit Plaintiffs to be transferred or reassigned "constituted an implied and/or constructive

---

**4.** Plaintiffs allege the Separation Agreements proposed "a much inferior payment and benefit package than was given to other employees who voluntarily terminated their employment with [D]efendants during 1992." Complaint, ¶ 35.

contract of employment, terminable only for good cause." *Id.,* ¶ 59. Plaintiffs also allege they "relied upon and were led to believe by [D]efendants' assurances as aforesaid that these representations constructively constituted a contract of employment." *Id.,* ¶ 60. Plaintiffs further allege they were terminated on 29 April 1994, "effectively breaching [P]laintiffs' contracts," without offering them transfers to other positions. *Id.,* ¶¶ 62–63.

The sixth count of the Complaint alleges Defendants are liable, pursuant to the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. §§ 10:5–1 to 10:5–42, for violating "the [P]laintiffs' civil rights based on their age and race...." Complaint, ¶¶ 65–67.

The seventh count of the Complaint alleges the Defendants discriminated against Nobles based upon her race, in violation of 42 U.S.C. § 1981. Complaint, ¶¶ 68–72. Plaintiffs allege, on information and belief, that Nobles "and other black employees were treated differently from other employees in the performance rating they received from [D]efendants." *Id.,* ¶ 70.

Count eight of the Complaint alleges Defendants are liable for intentional infliction of emotional distress. Complaint, ¶¶ 73–75. Plaintiffs allege that Defendants, from 1991 through 30 April 1994, acted maliciously and in bad faith, "solely to mislead and injure the [P]laintiffs financially and emotionally...." *Id.,* ¶ 74.

The ninth count of the Complaint alleges the acts of the Defendants were "wilful, unlawful, malicious and in wanton disregard of the rights and feelings of all the [P]laintiffs," thereby warranting the imposition of punitive damages. Complaint, ¶¶ 76–78.

The tenth count of the Complaint alleges Defendants are liable for violations of 29 U.S.C. §§ 1132(a)(3) and 1140, the Employee Retirement Income Security Act of 1974 ("ERISA"). Complaint, ¶¶ 79–81.

*Discussion*

A. *Summary Judgment Standard of Review*

█ To prevail on a motion for summary judgment, the moving party must establish "there is no *genuine* issue as to any

*material fact* and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added). The present task is to determine whether disputed issues of fact exist and whether one party is entitled to judgment. A district court, however, may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party") (citations and internal quotations omitted). A disputed fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

█ In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 847 (3d Cir.1996) (citing *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)); *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 330 (3d Cir.1995) ("In reviewing the record the court must give the nonmoving party the benefit of all reasonable inferences.") (citations omitted).

█ Although the summary judgment hurdle is difficult to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has demonstrated the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original) (citations omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

In *Anderson*, the Supreme Court held "[i]f the evidence [submitted by the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. Stated another way, the standard is whether "reasonable minds could differ as to the import of the evidence. . . ." *Id.* at 250, 106 S.Ct. at 2511; *see also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993) (observing that for issue to be considered genuine non-moving party must adduce more than a mere scintilla of evidence in its favor). In addition, when the factual context renders a claim implausible, the non-movant has a heavier burden of production in opposing a motion for summary judgment. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. "Summary judgment may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986)).

Discovery in this case was comprehensive. A review of all the submissions reveals no factual dispute that can be described as "material" in light of the controlling case law. The issue, then, is the legal consequence of the above-reviewed facts. Plaintiffs do not dispute they were aware their positions would be eliminated following CRIS Standardization. The gravamen of the dispute concerns assurances that the Plaintiffs would be reassigned to other positions.

## B. *Estoppel Claim*

The first count of the Complaint names all Defendants. Although count one of the Complaint contains the caption "Promissory Estoppel and Unfair Termination," it also alleges the termination of Plaintiffs was contrary to the public policy of the State of New Jersey, alleges discrimination on grounds of age and race and refers to equitable estoppel. Complaint, ¶¶ 37–40. All Defendants seek summary judgment on this count.

In *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), the Supreme Court of New Jersey recognized a limited exception to the at-will employment rule. *In Pierce*, the defendant, Ortho, had employed the plaintiff as a research doctor. The plaintiff's last assignment concerned development of a drug containing saccharin, concerning which there was medical controversy. *Id.* at 62–63, 417 A.2d 505. The plaintiff refused to continue work on the project or to prepare an investigational drug application with the Food and Drug Administration; she contended such work would cause her to violate her interpretation of the Hippocratic Oath. After being given another assignment, which she considered a demotion, the plaintiff resigned and filed suit. *Id.* at 64, 417 A.2d 505.

The New Jersey Supreme Court determined "that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce*, 84 N.J. at 72, 417 A.2d 505. After reviewing the facts in the case before it, however, the court determined the plaintiff had not established she was terminated in violation of such a public policy mandate. In so holding, the court observed that testing of the relevant product on humans was not imminent; pre-clinical tests on animals had not yet begun. *Id.* at 73–74, 417 A.2d 505. The project at issue did not, on its face, violate the Hippocratic Oath, nor did it violate any code of professional ethics or statute. The plaintiff did not argue her work would subject her to medical malpractice.

*Id.* at 74, 417 A.2d 505. "Viewing the matter most favorably to [the plaintiff], the controversy at Ortho involved a difference in medical opinions." *Id.* at 75, 417 A.2d 505. The court held summary judgment in favor of the defendant was proper. *Id.* at 75–76, 417 A.2d 505.

■ The Plaintiffs in this case have not identified any public policy violated by the Defendants' decision to carry out the RIF. To the extent the Plaintiffs allege a *Pierce* claim grounded on a public policy supporting the doctrine of equitable estoppel, such a claim is not cognizable under New Jersey case law. *DeVries v. McNeil Consumer Prods. Co.,* 250 N.J.Super. 159, 172–73, 593 A.2d 819 (App.Div.1991).

■ Although the Plaintiffs contend in count one that they were terminated because of age or race, they have offered nothing beyond the allegation contained in the Complaint. The submissions offer no explanation or affidavits in support of this argument. *See Geraci v. Moody–Tottrup, Int'l. Inc.,* 82 F.3d 578, 580 (3d Cir.1996) (reviewing settled Federal standard for demonstrating indirect evidence of unlawful discrimination); *Orson,* 79 F.3d at 1366 (indicating that once movant shows absence of genuine issue for trial, nonmovant may not rest upon mere allegations in pleadings) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53).

■ In the caption to the first count of the Complaint, Plaintiffs allege a cause of action grounded on promissory estoppel. Promissory estoppel is, a cause of action related to breach of contract. The purpose of such a claim is to compensate a party who has reasonably relied on the promise of another, although all the elements of a breach-of-contract claim, such as mutual consideration, cannot be established. *Leonardis v. Burns Int'l Sec. Svcs., Inc.,* 808 F.Supp. 1165, 1182 (D.N.J.1992). The elements of promissory estoppel are (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that it will induce reliance by the promisee; (3) the promisee must reasonably rely upon the promise; and (4) the promisee must experience detriment of a definite and substantial

nature by relying on the promise. *R.J. Longo Constr. Co. v. Transit Am., Inc.,* 921 F.Supp. 1295, 1305 (D.N.J.1996) (citing *Royal Assocs. v. Concannon,* 200 N.J.Super. 84, 91–92, 490 A.2d 357 (App.Div.1985)); *Fairken Assocs. v. Hutchin,* 223 N.J.Super. 274, 279–80, 538 A.2d 465 (L.Div.1987). The facts do not establish a clear and definite promise by Defendants to the Plaintiffs. As well, the facts indicate the Plaintiffs were all aware that their positions were to be eliminated following CRIS Standardization and, although they were told efforts were being made to relocate them, they were encouraged to pursue positions on their own. *See, e.g.,* Cleary Dep. at 30–31 ("I basically told them that they really needed to work very closely with their managers to make sure that they had their skills inventory, data base updated, to let people know what their desires were. I always reminded them that they were responsible for their own career."). Further, the Plaintiffs have not established reliance. The facts indicate Plaintiffs were aware that their positions would be eliminated following CRIS Standardization and actively pursued other openings through the STAR system. Accordingly, plaintiffs have failed to establish any genuine issue of material fact as to their promissory estoppel claim. As well, the Plaintiffs have not established a genuine issue of material fact as to the equitable estoppel claim. *See Quigley, Inc. v. Miller Family Farms,* 266 N.J.Super. 283, 296, 629 A.2d 110 (App.Div.1993) (indicating elements of equitable estoppel are a misrepresentation of material fact, reasonable and justifiable reliance and resulting damages); *Klein v. State, Dep't of Transp.,* 264 N.J.Super. 285, 290, 624 A.2d 618 (App.Div.) (same), *cert. denied,* 134 N.J. 481, 634 A.2d 528 (1993). Summary judgment is granted on the first count of the Complaint with respect to all Defendants.

*C. Fraud*

■ The second count of the Complaint names all Defendants. Plaintiffs allege Defendants knowingly and intentionally made false and misleading statements to induce them to remain at their positions with CRIS–New Jersey. Complaint, ¶¶ 41–45. All Defendants seek summary judgment on this count. Plaintiffs must demonstrate that (1)

the Defendants made a misrepresentation of material fact; (2) the misrepresentation was made with knowledge of its falsity; and (3) Plaintiffs justifiably relied on the misrepresentation to their detriment. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir.1993) (citing *Jewish Ctr. of Sussex County v. Whale*, 86 N.J. 619, 624–25, 432 A.2d 521 (1981)); *Rodio v. Smith*, 123 N.J. 345, 352, 587 A.2d 621 (1991); *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 51–52, 477 A.2d 1224 (1984).

■ In this case, the facts establish Defendants clearly indicated to Plaintiffs that their positions would be eliminated following CRIS Standardization. The facts establish an intent by the Defendants to find other work for the Plaintiffs, and, of the seventy-seven individuals whose jobs were eliminated in connection with CRIS–New Jersey, Defendants relocated all but eighteen. Defendants' Rule 12G Statement at 17 (citing Reilly Aff., Ex. L). On these facts, there is no evidence Defendants made false representations with knowledge of their falsity. Their actions demonstrate the Defendants were sincere in attempting to relocate the individuals whose jobs were eliminated. As well, Plaintiffs were apprised of the material facts surrounding their employment and the subsequent RIF.

■ As discussed, the Plaintiffs have also failed to provide evidence of reliance. The facts in the instant matter provide a useful contrast to *Shebar v. Sanyo Bus. Sys. Corp.*, 111 N.J. 276, 544 A.2d 377 (1988), in which the Supreme Court of New Jersey indicated there was a genuine issue of material fact whether the plaintiff established the elements of fraud. *Id.* at 292, 544 A.2d 377.

In *Shebar*, the plaintiff was concerned with his employer's practice of promoting primarily Japanese nationals to senior management and he decided to approach an executive search firm. He received an interview at Sony, a firm whose upper level management contained many American nationals. Sony offered him a position as a national sales manager and gave him express assurances that he would be made a vice president. 111 N.J. at 281, 544 A.2d 377. The plaintiff accepted the position with Sony and tendered

his resignation to his employer. His employer refused to accept his resignation, destroying it while telling the Plaintiff he was guaranteed a job for the rest of his life. *Id.* at 282, 544 A.2d 377. When the Plaintiff indicated to the executive search firm that he revoked his acceptance at Sony, he was told his current employer had actually been busy attempting to replace him during the time his resignation was refused. Four months later, the Plaintiff was summarily fired. *Id.* at 282–83, 544 A.2d 377. The court held there was a genuine issue of material fact whether the Plaintiff had established fraud. *Id.* at 292, 544 A.2d 377.

On the facts in the instant matter, summary judgment is appropriate on the Plaintiffs' fraud claim with respect to all Defendants.

### D. *Conspiracy to Violate Civil Rights of Plaintiffs*

The third count of the Complaint names all of the Defendants, alleging they conspired to violate the civil rights of the Plaintiffs, in violation of 42 U.S.C. §§ 1985(3) and 1986. Plaintiffs allege Defendants intentionally or recklessly violated their right not to be discriminated on the basis of race. Complaint, ¶¶ 46–51. Defendants seek summary judgment with respect to Szygenda, Gamba and Smith on this count.

■ The Plaintiffs' submissions do not address these allegations. To state a claim under 42 U.S.C. § 1985(3) ("Section 1985(3)"), Plaintiffs must allege a conspiracy motivated by a discriminatory animus for the purpose of depriving a person or class of persons of the equal protection of the law. Plaintiffs must also allege an act in furtherance of the conspiracy whereby a person is injured. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993) (rejecting claim that blockades of abortion clinics were Section 1985(3) conspiracies to violate Constitutional rights of women); *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828–30, 103 S.Ct. 3352, 3355–57, 77 L.Ed.2d 1049 (1983) (rejecting application of Section 1985(3) to conspiracies against em-

ployees of non-union entity); *Hobson v. Wilson*, 737 F.2d 1, 14 (D.C.Cir.1984) (noting that four elements must be proved in a Section 1985(3) claim: (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *see also Burt v. Ferrese*, 871 F.2d 14, 17 (3d Cir.1989) (observing Section 1985(3) claim must demonstrate "invidious discriminatory animus") (citing *Scott*, 463 U.S. at 834–39, 103 S.Ct. at 3359–62).

█ The requirement that the conspiracy be motivated by class-based animus was added by the Supreme Court in *Griffin v. Breckenridge*, 403 U.S. 88, 101–02, 91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338 (1971). The *Griffin* Court held that to give "full effect" to the Congressional purpose of Section 1985(3), and to avoid construing Section 1985(3) as merely "a general [F]ederal tort law, . . . . there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Id.* at 102, 91 S.Ct. at 1798 (footnotes omitted). Accordingly, Section 1985(3) "does not apply to *all* conspiratorial tortious interference with the rights of others, but only to those motivated by some class-based, invidiously discriminatory animus." *Hobson*, 737 F.2d at 14 (emphasis in original); *see also Burt*, 871 F.2d at 17.

█ In the instant matter, Plaintiffs have set out no facts in support of their Section 1985(3) claim. There are no affidavits to indicate the RIF was prompted by discriminatory animus. Summary judgment is granted on this count with respect to Szygenda, Gamba and Smith because Plaintiffs have provided nothing more than conclusory alle-

gations to support this claim.[5] *See Orson*, 79 F.3d at 1366; *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990).

### E. Tortious Interference With Contract

Plaintiffs allege Defendants engaged in tortious interference with employment contracts between BANS and Plaintiffs. Complaint, ¶¶ 52–57. All Defendants seek summary judgment with respect to this count.

█ Under New Jersey law, the elements of a claim of tortious interference with contract are (1) a plaintiff's existing or reasonable expectation of economic advantage or benefit; (2) a defendant's knowledge of the plaintiff's expectancy; (3) wrongful and intentional interference with that expectancy by the defendant; (4) a reasonable probability that the plaintiff would have received the anticipated economic advantage absent such interference; and (5) damages resulting from the defendant's interference. *Lightning Lube*, 4 F.3d at 1167 (citing *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir.1992), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751–53, 563 A.2d 31 (1989)). "Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law." *Printing Mart–Morristown*, 116 N.J. at 753, 563 A.2d 31; *see Cappiello v. Ragen Precision Indus., Inc.*, 192 N.J.Super. 523, 529, 471 A.2d 432 (App.Div.1984) (stating that tortious interference with contract "requires the meddling into the affairs of another") (citing *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 450, 358 A.2d 805 (App.Div.), *cert. denied*, 71 N.J. 503, 366 A.2d 658 (1976)).

█ In this case, Plaintiffs allege Defendants, or one of their agents, interfered with their employment contracts with BANS. Because the tort of interference with contractual relations presupposes interference by a non-party to the contract, summary judgment is granted with respect to all Defen-

---

5. The claim alleged pursuant to 42 U.S.C. § 1986 fails because that statute provides one may be liable for neglecting or refusing to prevent a violation of Section 1985. As indicated, summary judgment is granted with respect to the Section 1985(3) claim.

dants on this claim. *Cf. Shebar*, 111 N.J. at 292, 544 A.2d 377 (determining there was a genuine issue of material fact whether plaintiff established defendant was liable for tortious interference with contract where defendant induced plaintiff to revoke acceptance of employment with other firm); *Obendorfer v. Gitano Group, Inc.*, 838 F.Supp. 950, 956 (D.N.J.1993) (dismissing claim by employee against supervisor for tortious interference where supervisor was acting in the course of his employment at the time he committed the complained-of acts).

### F. *Breach of Contract*

 Plaintiffs allege Defendants are liable for breach of contract by providing assurances of continuing employment and refusing to allow them to be reassigned elsewhere within BAC or BANS. Complaint, ¶¶ 58–64. All Defendants seek summary judgment on this claim.

Plaintiffs concede they do not rely upon a written contract. "[P]laintiffs simply assert an implied contract with the employer based on a contractual understanding and a history of dealing and experience and corporate culture." Opposition Brief at 39. "Essentially, the corporate history and culture and the policies of the company since [P]laintiffs' employment formed a unilateral contract: 'if you do what we ask, you will not be terminated.'" *Id.*

As indicated in *Shebar*, the Supreme Court of New Jersey set out the prevailing "at will" employment rule in *Savarese v. Pyrene Mfg. Co.*, 9 N.J. 595, 89 A.2d 237 (1952). *Savarese* held:

> [I]n the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of contract justifying recovery of money damages therefor.

*Id.* at 600–01, 89 A.2d 237 (citations and quotations omitted). The Supreme Court of New Jersey reaffirmed the *Savarese* rule in *Shebar*, indicating proof of lifetime employment must be "'clearly and unequivocally expressed in the contract itself.'" *Shebar*, 111 N.J. at 285, 544 A.2d 377 (quoting *Savarese*, 9 N.J. at 603, 89 A.2d 237); see *Obendorfer*, 838 F.Supp. at 953 (quoting *Savarese*, 9 N.J. at 600–01, 89 A.2d 237).

Although Plaintiffs argue they have an enforceable contract for lifetime employment pursuant to *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985), that case is distinguishable. In *Woolley*, the Supreme Court of New Jersey held that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will." *Id.* at 285–86, 491 A.2d 1257. *Woolley* was limited to commitments arising from written communications by an employer and did not affect the principles set out in *Savarese*.

In this case, the Plaintiffs were aware their positions would be eliminated. They were given assurances that efforts would be made to relocate them, and some displaced employees were in fact relocated. New Jersey law demands specific, concrete evidence of a contract for lifetime employment, and neither "corporate culture" nor the assurances of relocation in the instant case are sufficient to demonstrate such contracts. Accordingly, summary judgment is granted as to all Defendants with respect to this claim. *See Shebar*, 111 N.J. at 285, 544 A.2d 377 (citing *Savarese*, 9 N.J. at 603, 89 A.2d 237); *id.* at 286, 544 A.2d 377 (indicating words that "'partake more of the nature of a "friendly assurance of employment"'" are not grounds for a lifetime employment contract) (quoting *Savarese*, 9 N.J. at 603, 89 A.2d 237).

### G. *New Jersey Law Against Discrimination Claim*

 Plaintiffs allege Defendants are liable pursuant to the LAD, N.J.S.A. §§ 10:5–1

to 10:5–42, for discharging them "based on their age and race." Complaint, ¶¶ 65–67. Szygenda, Smith and Gamba seek summary judgment with respect to this claim.

The LAD provides in pertinent part: It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. . . .

N.J.S.A. § 10:5–12. In the employment context, the LAD employs procedural burdens and presumptions similar to Federal standards. *McKenna v. Pacific Rail Svc.*, 32 F.3d 820, 827 (3d Cir.1994) (citing *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 600, 626 A.2d 445 (1993); *Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 97–98, 570 A.2d 903 (1990)); *Shaner v. Horizon Bancorp.*, 116 N.J. 433, 437, 561 A.2d 1130 (1989) (citing *Peper v. Princeton Univ. Bd. of Trustees*, 77 N.J. 55, 81, 389 A.2d 465 (1978); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

In this case, Plaintiffs have offered no evidence at all for this claim. They have not even indicated the ages or races of the fifty-nine CRIS–New Jersey employees who were relocated. They have done nothing to build a *prima facie* case for discrimination. This count is dismissed as to Smith, Gamba and Szygenda.

### H. *Claim By Nobles of Racial Discrimination*

Nobles alleges she was terminated because of her race, in violation of 42 U.S.C. § 1981. Complaint, ¶¶ 68–72. Defendants seek summary judgment on this count with respect to Szygenda, Smith and Gamba. Plaintiffs have offered nothing but the allegations set out in the Complaint on this count. For the same reasons summary judgment is appropriate on Plaintiffs' Section 1985(3) and LAD claims, summary judgment is granted with respect to Szygenda, Gamba and Smith on this count.

### I. *Intentional Infliction of Emotional Distress*

Plaintiffs allege Defendants are liable for intentional infliction of emotional distress for discharging them. Complaint, ¶¶ 73–75. All Defendants seek summary judgment as to this claim.

Under New Jersey law, recovery for intentional infliction of emotional distress requires proof of extreme and outrageous conduct that goes beyond all bounds of decency and is " 'atrocious, and utterly intolerable in a civilized community.' " *Bishop v. Okidata, Inc.*, 864 F.Supp. 416, 427 (D.N.J.1994) (quoting *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 366, 544 A.2d 857 (1988)).

The following elements comprise the tort of intentional infliction of emotional distress. There must be an intentional act, committed with the intent to produce emotional distress or in deliberate disregard of a high degree of probability that emotional distress will follow. There must be causation and resulting emotional distress that is " 'so severe that no reasonable [person] could be expected to endure it.' " *Glenside West Corp. v. Exxon Co., USA*, 761 F.Supp. 1100, 1113 (D.N.J.1991) (citations omitted).

One New Jersey court concluded a plaintiff established the elements of this tort after a physician intentionally told parents that their son had cancer, knowing that the statement was false. *Glenside West*, 761 F.Supp. at 1113 (citing *Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (L.Div.1981)). Another court found such a claim was possible where a hospital was unable to locate the body of a deceased baby for three weeks. *Id.* (citing *Muniz v. United Hosps. Med. Ctr. Presbyterian Hosp.*, 153 N.J.Super. 79, 379 A.2d 57 (App.Div.1977)). Other courts have deter-

mined awards for intentional infliction of emotional distress were appropriate, in a case where a defendant spread a false rumor that the plaintiff's son had hung himself, in another case involving defendants who brought a mob to the plaintiff's door and threatened to lynch him if he did not leave town, and in another case where " 'a gory dead rat [was wrapped] inside a loaf of bread for a sensitive person to open.' " *Id.* at 1113–14 (citations omitted).

The facts of this case do not support a claim for intentional infliction of emotional distress. Nothing indicates the Defendants intended to cause emotional distress, nor have causation or damages been established. Defendants terminated the Plaintiffs as part of an RIF. Courts have been particularly reluctant to allow claims for intentional infliction of emotional distress by discharged employees against their employers. *See, e.g., Carney v. Dexter Shoe Co.,* 701 F.Supp. 1093, 1104 (D.N.J.1988) (granting summary judgment in favor of employer in suit brought by discharged employee); *Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 354, 633 A.2d 985 (App.Div. 1993) (affirming rejection of claim by discharged employee of intentional infliction of emotional distress), *cert. denied,* 135 N.J. 468, 640 A.2d 850 (1994). Accordingly, summary judgment is granted as to all Defendants with respect to this claim.

### J. *ERISA Claim*

Plaintiffs allege Defendants violated 29 U.S.C.A. §§ 1132(a) and 1140. Complaint, ¶¶ 79–81. Smith, Gamba and Szygenda seek summary judgment with respect to this count. Section 1132(a) of Title 29 entitles a beneficiary or participant in an ERISA-approved retirement plan to bring an action to recover benefits or enforce ERISA-provided rights. 29 U.S.C. § 1132(a). Section 1140 of title 29 provides "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under [ERISA]." 29 U.S.C. § 1140. Under this count, Plaintiffs apparently allege they were terminated in retaliation for exercising rights provided un-

der ERISA. They have offered no explanation or affidavits in their submissions for this claim. Summary judgment is granted in favor of Smith, Szygenda and Gamba with respect to this claim.

### K. *Punitive Damages*

Plaintiffs allege Defendants engaged in wilful, wanton and malicious behavior, entitling them to punitive damages. Complaint, ¶¶ 76–78. Smith, Gamba and Szygenda seek summary judgment with respect to this count. Because the Motion for Partial Summary Judgment is granted as to all the substantive counts, there is no basis for the award of punitive damages. Summary judgment is granted in favor of Smith, Szygenda and Gamba with respect to the claim for punitive damages.

### *Conclusion*

For the reasons stated, the Motion for Partial Summary Judgment is granted.