Manuel SILVESTRE, Plaintiff,

v.

BELL ATLANTIC CORP.,
et al., Defendants.

Civil Action No. 95–1399.

United States District Court,
D. New Jersey.

July 15, 1997.

As Amended Aug. 21, 1997.

476

Arthur G. Nevins, Jr., Jersey City, NJ, for Plaintiff.

Francis X. Dee, Vincent P. Browne, Thomas C. Bigosinski, Newark, NJ, for Defendants.

*OPINION*

WOLIN, District Judge.

This case is before the Court on the motion for summary judgment submitted by defendants the Bell Atlantic Corporation ("BAC"), Bell Atlantic–New Jersey ("BA–NJ"), Michael Losch, Bill Williams, and Raymond Smith. Plaintiff Manuel Silvestre has opposed summary judgment. The Court has considered the motion under Federal Rule of Civil Procedure 78. For the reasons stated herein, the defendants' motion for summary judgment will be granted on all counts.

Silvestre alleges several causes of action against the defendants. In his first and second counts, Silvestre alleges that in October of 1984 the defendants discharged him because of his age (47 at the time of termination), national origin (Philippines), and race (Asian–Pacific Islander), in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. section 10:5–1 *et seq.* and 42 U.S.C. section 1981. In his third count, Silvestre alleges that the defendants also conspired to terminate his employment in violation of 42 U.S.C. sections 1985(3), 1986, and 1988. In his fourth count, Silvestre alleges that the defendants are liable for

outrageous conduct, deceit, and the prima facie tort. In his fifth count, Silvestre alleges tortious and intentional interference with contract. In his sixth count, Silvestre alleges negligent hiring and supervision. Silvestre alleges as his seventh count intentional infliction of mental and emotional distress. Lastly, Silvestre makes claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3) and 1140. In his ninth count, Silvestre claims a right to punitive, compensatory, and exemplary damages, back pay, reinstatement, attorneys' fees, interest, and costs.

The defendants move for summary judgment on each count.

**BACKGROUND**

**I. Silvestre's Performance at BAC–NJ**

Silvestre was employed by BAC–NJ between September 11, 1972 and October 31, 1994. Silvestre did not receive a promotion in the fifteen years prior to his termination. (Silvestre Dep. at 383:22–285:22.)

In his 1991 Management Performance Appraisal and Development Plan, Silvestre's supervisor Kiliany rated Silvestre "MA" (meets all requirements) in the Communication Skills–Oral/Written category. (Pl. 12G ¶ 39.) Kiliany rated Silvestre this "MA" score in 8 of 11 categories. (*Id.*) Kiliany rated Silvestre an "FE" (far exceeds) in the "Planning/Organizing/ Controlling Skills" category. (*Id.*) Kiliany rated Silvestre "MM" (meets most) in the Job/Functional Knowledge category. (*Id.*)

In his 1992 Management Performance Appraisal and Development Plan, Kiliany rated Silvestre's skills at better than average and above average. (*Id.* ¶ 40.)

William Kiliany provided a January through June of 1993 appraisal for Silvestre. (*Id.* ¶ 30.) This appraisal contained no numbered ratings, but praised Silvestre's performance. (*Id.* ¶ 30, 32.)

Bill Williams' first evaluation of Silvestre's performance had covered July through December of 1993. Williams observed under the heading of "Communication Skills" that "[w]hile Manuel listens attentively and un-

derstands what he is being told, there is a communication problem due to English being his second language. It is most noticeable during telephone conversations. Often Manual [sic] will ask his co-workers to make calls for him in an affort [sic] to avoid doing them himself." Williams had received this feedback from Silvestre's co-workers Cheryl Grafje, Joe Feehan, Betty Hunt, and Lyn Condon. Silvestre admits that English is his second language. Silvestre denies that he asked co-workers to make calls for him. (*Id.* ¶ 48.) Silvestre indicates that no one ever told him that they could not understand him. (*Id.* ¶ 47.)

Williams signed this evaluation on March 11, 1994. Silvestre claims that he did not see the evaluation until he requested it in September of 1994, at which time Williams immediately produced the evaluation.

A 1994 Performance Agreement prepared by Silvestre and Williams identified Silvestre's "Primary Assignments" and "Objectives" for the 1994 work year. (Silvestre Dep. at 96:11–98:15; Dee Aff., Ex. O.) The listed objectives included: (1) to redesign monthly tracking reports for each of the Operating Telephone Company departments by the end of the first quarter, (2) to review tutorials and increase proficiency in both VIVID and WordPerfect by year-end, (3) to attend training courses for OPUS and SFS, (4) to meet with representatives to design a vehicle to communicate budget/actual impacts and to communicate with representatives on a monthly basis, (5) to prepare best view analyses, and (6) to design department tracking reports for Al Koeppe's direct reports. Silvestre indicates that he did not receive the objectives until late March of 1994. (Pl. 12G ¶ 57.)

Silvestre admits that although he was employed until October 31 of 1994, he had not finalized any tracking reports for the seven OTCs. (Silvestre Dep. at 98:22–99:5, 104:5–17.) Silvestre indicates that he was in the process of doing so at the time of his termination. (Pl. 12G ¶ 57.)

Silvestre claims that he did not pursue VIVID or WordPerfect because his work requirements did not dictate the need and he did not have the time. (Silvestre Dep. at 99:6–100:12, 101:15–102:1, 165:2–4.)

Silvestre admits that he did not attend any training courses for OPUS or SFS and was not proficient in either. (Id. at 102:2–25.) He indicates that the reason was because he was not "assigned to any." (Pl. 12G ¶ 57.)

Silvestre admits that he did not meet with representatives or contact them monthly. (*Id.* at 106:5–108:25.)

Silvestre admits that he did not prepare the best view analyses. (*Id.* at 109:25–111:23.) He indicates that this was because he was instead assigned the functions of Michael O'Brien, who transferred to Philadelphia. (*Id.* at 110:4–22.)

Silvestre indicates that he completed the tracking reports, "but did not know whether or not they were utilized." (*Id.* at 105:20–25.)

Williams' second evaluation of Silvestre covered the period between January and June of 1994. This evaluation criticized Silvestre's initiative, work ethic, and work habits. (Dee Aff., Ex. M.) Silvestre admits that he received this evaluation and signed it on July 15, 1994. Silvestre argues that he did not read the appraisal at this time, but was in a hurry and signed it and did not request a copy. (Pl. 12G ¶ 49.)

Williams' final evaluation of Silvestre covered the period of July through September of 1994. Silvestre admits to receiving and signing this appraisal on September 29, 1994. Silvestre indicates that he disagreed with the appraisal at the time and expressed his desire not to sign it and that he signed it despite his hesitations. (Pl. 12G ¶ 52.)

Silvestre alleges that the performance appraisals done by Williams for the second half of 1993 and the first half of 1994 did not accurately reflect his abilities and made unfounded criticisms. Silvestre also alleges that these evaluations were concealed from him or presented to him in a manner that prevented him from being able to voice his disagreement.

## II. The Reduction in Force

In past decades, BAC was divided into geographical regions. Each of the operating companies, BA–NJ, Bell Atlantic–Pennsylvania, Bell Atlantic–Delaware, Bell Atlantic–Virginia, Bell Atlantic–West Virginia, Bell Atlantic–Maryland, and Bell Atlantic–Washington D.C., had its own Board of Directors and controlled operations within its geographical area.

In early 1993, however, BAC began to restructure to operate pursuant to lines of business, rather than geographical areas. The BAC Finance Department began to reorganize the existing regional finance operations of its seven operating companies into a "Line of Business" ("LOB") structure. The Finance Department re-engineered and realigned work functions and consolidated redundant functions among the operating companies. LOB restructuring also resulted in the elimination of the BA–NJ Board of Directors and of the concomitant need to supply a separate BA–NJ Board of Directors with financial information.

As early as March of 1993, BA–NJ finance employees, including Silvestre, were notified of the forthcoming restructure necessitated by the adoption of the LOB structure. BA–NJ informed employees, including Silvestre, of the factors that a Finance/Human Resources Task Force ("Task Force") would consider in future staffing decisions, including: the requirements of the new position, Human Resources staffing policies and guidelines, succession planning/developmental planning needs, job location, self-nomination,[1] diversity, and a candidate's skills, experience, and job performance.

In early June 1993, Silvestre received a memorandum from the Task Force setting forth the staffing process for his salary grade. The memorandum indicated that "the LOB reorganization displaces personnel in some (but not all) existing organizations," and that some finance employees' positions would be eliminated. The memo cautioned all employees that "it may be in the best interests of the Company to make a job change that results in a better overall match of skills."

Group meetings were held at this time to discuss the new organizational structure. Employees were told that there would be fewer jobs within the corporation as a result of restructuring.

In 1993 and 1994, at "pizza lunches," personnel in the Finance Department discussed the reorganization of that department and Silvestre was told that positions would be eliminated and that employees should look for other jobs.

During the second quarter of 1993, Silvestre was given the opportunity to transfer to another department, but opted to remain in the Finance Department.

On or about January 26, 1994, Silvestre received a memo from Barbara Connor, the Vice President for the Finance Department at BAC, entitled "Finance Process and Organization Evaluation." The memo indicated that the Finance Department was not effective or properly organized, that an evaluation of Finance processes was necessary, that realignment might be appropriate, and that additional "right sizing" might be needed to enable Financial to operate more efficiently and effectively.

In February of 1994, Ron Von Stetina, Chairperson of the Advisory Panel that had been formed to analyze the efficiency of the financial processes, issued a package to follow up on Connor's January 1994 letter. This package was addressed particularly to employees whose responsibilities focussed on "the planning, budgeting, reporting, and analysis processes as well as any other financial processes where significant opportunity for improvement exists." The Advisory Panel listed three criteria indicative of success in the financial processes (1) the total cost; (2) customers should "be delighted" to work with the employees; and (3) the employees should do their jobs better.

---

1. "Self nomination" describes the practice under which employees could use certain services, provided by the Company, including the S\*T\*A\*R\* System and the Finance Vacancy Report, to apply for positions in other groups and departments within BAC. Finance employees who did not self-nominate under one of these services were not guaranteed their current jobs.

It appears from the record that during the eighteen month time frame between when Silvestre first learned of the transformation to the LOB (in early 1993) and the date of his termination (October 31, 1994), that Silvestre did nothing to enhance his skills. He cannot recall taking any training courses or computer classes, asking a supervisor how to improve his performance, or requesting client feedback, for example. (Silvestre Dep. at 164:4–7, 165:14–17, 185:25–186:3, 233:19–23, 235:19–236:9.)

Losch, Connor, and Ned Hall determined the number of BA–NJ Finance Department positions that would be eliminated. Losch sought advice from his management team, comprised of the managers from each of the groups under Losch's direct supervision. Bill Williams managed the Financial Assurances Group. Michael Nicolette, Manager of State and Local Taxes, Alina Rocha, Manager of Surveillance, and Carol Harris, Manager of Financial Independence Network also consulted with Losch on decisions concerning the restructuring and the RIF. Losch, Connor, and Hall decided to eliminate two first-level manager positions, salary grade LD.

To determine which individual employees would participate in the RIF, the Human Resources Department provided Losch with uniform scoring sheets that his group managers had used to evaluate the first-level managers, salary grade LD. The managers considered four weighted factors in assessing each employee: Job Performance (30%); Technical Skills (45%); Culture Change Skills (15%); and Leadership Results (10%). The managers prepared Finance 1st Level Selection Criteria Work Sheets ("Selection Criteria Work Sheets") for, in addition to Silvestre, John Barnes, Kathy Casavina, Betty Hunt, Angie Silverstein, and Paul Stropnicky. Losch used the completed forms to determine which employees would participate.

The following chart identifies the name, score, age, race, job title, salary grade, date of pension eligibility, and length of BAC service of each employee in the BA–NJ Finance Department whose salary grade was LD.[2]

| Employee | Score | Age | Race | Salary Grade | Date of Pension Eligibility | Length of Service |
|---|---|---|---|---|---|---|
| Casavina | 76 | 40 | White | LD | 7/10/97 | 22 years, 3 months |
| Stropnicky | 72.5 | 44 | White | LD | 3/8/2000 | 23 years, 11 months |
| Hunt | 64 | 48 | African–American | LD | 6/16/96 | 26 years, 8 months |
| Silverstein | 64 | 45 | White | LD | 10/21/98 | 26 years, 0 months |
| Silvestre | 53.5 | 47 | Pacific–Islander | LD | 9/11/97 | 22 years, 1 month |
| Barnes | 48 | 40 | White | LD | 4/29/2004 | 17 years, 0 months |

Silvestre[3] and Barnes, members of Williams' Financial Assurances group, received the lowest scores and were chosen for the RIF.

In addition to Silvestre, one other person classified as "Pacific–Islander," Gloria Shuang, participated in the 1994 Finance De-

2. Each employee's age and length of service is measured as of October 31, 1994.

3. At the time of the RIF, Silvestre was an Assistant–Manager. In 1993, Silvestre's primary responsibilities were: (1) distribution of Motor Vehicle provisioning and scrap handling rates, (2) analysis of Plant Specific and non-Plant Specific expense, (3) analyses of function and organization, (4) administration of Right–to–Use ("RTU") fees, (5) coordination of the Board of Directors package, and (6) coordination of executive tracking binders.

partment RIF. In August of 1993, Shuang began an extended leave of absence from her position as Manager in the Finance Department. Shuang had joined her husband in Taiwan. When Shuang received notice of the impending RIF, she requested permission to be included, to enable her to use the company's out placement services and to receive a severance payment and unemployment benefits. Losch, after consulting with Nicolette, granted Shuang's request.

Shuang has submitted a certification indicating that her participation in the RIF was entirely voluntary and that she was never discriminated against because of her national origin or race at BAC by Losch, Williams, or another person. Silvestre indicates that Shuang should not be considered by the Court, because she did not work under Bill Williams, but worked as a manager with him. (Pl. 12G ¶ 86.) Silvestre also distinguishes Shuang because she was not actively working in the company when the LOB restructuring began in March of 1993. (*Id.*) Last, Silvestre distinguishes Shuang because she left voluntarily. (*Id.*)

Silvestre alleges that he was replaced by a woman named Donna Griffin. (Pl. 12G ¶¶ 89, 90.) The defendants indicate that no one was hired into the Finance Department after August 1, 1994. (Defs. 12G Supp. ¶ 24.) The defendants indicate also that Griffin was transferred into Jim Furst's Revenues & Receivables Group (not the Finance Department) from the Corporate Accounting Group in Philadelphia. (*Id.*) The defendants indicate further that she left the Revenues & Receivables Group and has not been replaced. (*Id.*)

## DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Where a summary judgment motion is properly made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). An issue of material fact is genuine if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir.1996); *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993).

## I. The Court Must Grant Summary Judgment in Favor of the Defendants on Silvestre's Race, National Origin, and Age Discrimination Claims

Silvestre alleges in his First through Third Counts of his Amended Complaint that BA–NJ terminated him because of his age, race, and national origin in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, 1985(3), 1986, 1988, and N.J.S.A. 10:5–12 *et seq.*

*McDonnell Douglas Corporation v. Green* sets forth the burden of proof in federal discrimination cases. 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The New Jersey courts have interpreted the proofs and burdens of persuasion for discrimination under the New Jersey Law Against Discrimination ("LAD") in the same manner as that under Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000(e) *et seq. See Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 550, 569 A.2d 793 (1990); *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 595, 538 A.2d 794 (1988). Thus, both federal and New Jersey discrimination cases are applicable to Silvestre's claims.

First, the plaintiff bears the burden to prove by the preponderance of the evidence a *prima facie* case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Goodman v. London Metals Exch., Inc.*, 86 N.J. 19, 30–32, 429 A.2d 341 (1981).

In a reduction in force ("RIF") case, this first stage of the *McDonnell Douglas* framework requires that the plaintiff show "that he was in the protected class, he was qualified, he was laid off and other protected workers were retained." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994) (citing *Seman v. Coplay Cement Co.*, 26 F.3d 428, 431 (3d Cir.1994)). The plaintiff must establish these elements by a preponderance of the evidence. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824.

Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some "legitimate, nondiscriminatory reason for the employee's rejection." *See id.* The defendant need only introduce evidence of "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Third, if the defendant meets this burden, the plaintiff must show that the legitimate reasons offered by the defendant were not its true reasons, but were a mere pretext for the discrimination. *See id.* To establish that the employer's stated reasons for its action were a pretext for discrimination, the plaintiff must either (1) discredit the employer's proffered reasons, either circumstantially or directly, or (2) adduce evidence, circumstantial or direct, that discrimination was more likely than not a motivating cause of the adverse employment action. *See Waldron v. SL Indus., Inc.*, 56 F.3d 491, 495 (3d Cir. 1995); *Torre v. Casio, Inc.*, 42 F.3d 825, 830 (3d Cir.1994); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994).

## A. Silvestre Establishes a *Prima Facie* Case of Age, Race, and National Origin Discrimination

█ With regard to the first element of his *prima facie* case, Silvestre has succeeded on all three of his claims. With regard to his age discrimination claim, Silvestre was 47 at the time of his discharge. With regard to his national origin claim, Silvestre alleges that he is Filipino. And with regard to his race discrimination claim, Silvestre alleges that he is Asian/Pacific islander.

With regard to the second element of his *prima facie* case, establishing that the plaintiff was qualified, the Court finds that Silvestre has met the threshold of proof required. Silvestre indicates that prior to coming under the supervision of Bill Williams, Silvestre received good performance reviews, pointing to his 1990, 1991, 1992, and mid year 1993 evaluations. According to Silvestre, Williams and Losch deliberately downgraded Silvestre's 1993 appraisal ratings to include him in the RIF. Because a jury could find under the preponderance of the evidence standard that Silvestre was qualified, the Court finds this element of Silvestre's *prima facie* case to be satisfied.

With regard to the third element, Silvestre has also met his burden to establish a *prima facie* case of discrimination. While Silvestre was terminated, similarly situated non-minority employees were retained. For example, Casavina was white and 40 years old and was retained.

## B. Defendants Properly Have Rebutted Silvestre's *Prima Facie* Case Through Articulating a Legitimate Non–Discriminatory Reason For His Termination

Defendants have properly established that there was a legitimate reduction in force and have asserted that Silvestre was terminated because of this reduction in force. Defendants indicate that Silvestre was selected for the RIF because he had one of the two lowest scores on the Selection Criteria Work

Sheets. This is a legitimate reason for termination that rebuts Silvestre's *prima facie* case and puts the burden on Silvestre to demonstrate that the reason is merely pretextual.

## C. Silvestre Fails to Provide a Factual Basis on Which a Jury Could Reasonably Discredit the Defendants' Articulated Legitimate Reason For Terminating Him

■ To overcome the defendants' articulation of their legitimate reason, the reduction in force, Silvestre must show that the stated reason is a mere pretext or that the real reason for termination was discrimination.

"To discredit the employer's proffered reason, plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Fuentes v. Perskie,* 32 F.3d at 765. The plaintiff must present evidence sufficient to establish that the defendants' proffered reason for eliminating his position and terminating his employment is "weak, implausible, contradictory, or incoherent" or that an illegitimate factor was more likely than not a motivating or determinative cause. *See id.; see also. e.g., Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1263 (D.N.J.1994), *aff'd,* 67 F.3d 291 (3d Cir. 1995).

Silvestre has failed to meet his burden. Silvestre does not dispute that there was a reduction in force within BA–NJ's Finance Department in 1993. Rather, Silvestre conclusorily argues that the decision of Losch and Williams to select Silvestre to participate in the RIF pursuant to their assessment of the Selection Criteria Work Sheets was a pretext for discrimination. But, Silvestre has failed to introduce any evidence from which a jury could believe his version of events.

Silvestre first argues that he was qualified to remain with BAC and that his performance was satisfactory. But a plaintiff's disagreement with a defendant's evaluation of his performance, or the plaintiff's own perception of his performance, does not demonstrate pretext under the *McDonnell Douglas* framework. *See, e.g., Billet v. CIGNA Corp.,* 940 F.2d 812, 825–27 (3d Cir.1991) (observing that the plaintiff's "view of his performance is not at issue; what matters is the perception of the decision maker"); *Fowle v. C & C Cola,* 868 F.2d 59 (3d Cir.1989) (indicating that plaintiff's challenge to employer's conclusion that plaintiff lacked requisite leadership skills for position was immaterial to whether employer's stated justification for adverse employment decision was pretextual); *see also, e.g., Chou v. Rutgers,* 283 N.J.Super. 524, 545–46, 662 A.2d 986 (App. Div.1995) (superior's evaluation of plaintiff, even if not completely fair or impartial, does not support conclusion that employer's decision to deny promotion application was based on national origin, ancestry, or race), *certif. denied,* 145 N.J. 374, 678 A.2d 714 (1996). Consequently, Silvestre's conclusory allegations that he was qualified do not demonstrate that the defendants' explanation that he was legitimately terminated under the RIF was pretextual.

Silvestre also endeavors to discredit the defendants' explanation for the elimination of his position and his termination by observing that his previous supervisor evaluated him well. The Court finds this proffer inadequate, because previous evaluations are irrelevant to determining whether an evaluation at issue is merely pretextual. *See. e.g., Billet,* 940 F.2d at 826 ("prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual"); *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 343–44 (3d Cir.1990) (observing that performance evaluations of former supervisor were insufficient to create a material dispute of fact concerning present supervisor's sincerity in making adverse employment decision).

Next, Silvestre conclusorily alleges that Williams and Losch deliberately downgraded Silvestre's 1993 appraisal ratings to include him in the RIF.[4] Silvestre has not introduced

---

**4.** Silvestre also observes that Williams did not eat lunch with him or buy him a Christmas

present in 1993 and that he lost a friendly bet to Losch about whether the Mets or Yankees would

any evidence or pointed to any inconsistencies in the defendants' evidence that would allow a jury to discredit the defendants' version of events, however.

Silvestre also observes that on his July to December 1993 evaluation Losch and Williams indicated that "[w]hile Manuel listens attentively and understands what he is being told, there is a communication problem due to [E]nglish being his second language. It is most noticeable during telephone conversations. Often Manuel will ask his co-workers to make calls for him in an affort [sic] to avoid doing them himself." Silvestre has not demonstrated any basis for a jury to discredit the defendants' assessment of his language skills, or demonstrated that the reference to his language skills shows somehow that his inclusion in the RIF was a pretext for discrimination.

Silvestre does not suggest in any way that the defendants' legitimate explanation for the elimination of Silvestre's position and his termination was mere pretext. Indeed, Silvestre has admitted that neither Losch nor Williams ever made derogatory comments about Silvestre's age, national origin, or race. (Defs' 12G ¶ 24.) And Silvestre never complained to anyone at BAC or BA–NJ about discrimination. (*Id.*)

Thus, Silvestre has failed to demonstrate that the defendants' proffered explanation for his termination is merely pretextual. Silvestre's failure to proffer proof or to demonstrate any basis in the record for a jury to discredit the defendants' proffered legitimate reasons for the elimination of his position and his termination requires that the Court grant summary judgment in favor of the defendants on Silvestre's claims of unlawful termination on the basis of race, national origin, and age.

## D. Silvestre Also Fails To Establish A Violation of Sections 1985(3), 1986, or 1988

 To establish a violation of section 1985(3), the plaintiff must allege and prove: (1) a conspiracy motivated by invidious discriminatory animus, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy; and (4) as a result, a person either is injured in his person or deprived of any right or privilege of a citizen of the United States. *See, e.g., Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268, 113 S.Ct. 753, 758–59, 122 L.Ed.2d 34 (1993); *Burt v. Ferrese*, 871 F.2d 14, 17 (3d Cir.1989); *Pitak v. Bell Atl. Network Servs., Inc.*, 928 F.Supp. 1354, 1368–69 (D.N.J.1996). A section 1985(3) conspiracy claim must be pleaded with factual specificity. *See Church of Human Potential, Inc. v. Vorsky*, 636 F.Supp. 93 (D.N.J.1986).

 Because Silvestre has failed to establish any invidious discriminatory animus on the part of the defendants, to allege or prove an agreement, or to plead his claim with any factual specificity, the Court must dismiss this section 1985(3) claim.

 The failure of Silvestre's section 1985(3) claim also mandates that the Court grant summary judgment on Silvestre's section 1986 claim. 42 U.S.C. section 1986 is a companion statute to section 1985(3) and provides a remedy for misprision of a section 1985(3) conspiracy. Thus, Silvestre's failure to establish 1985(3) claim dooms this claim as well. *See. e.g., Rogin v. Bensalem Township*, 616 F.2d 680, 697 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Church of Human Potential*, 636 F.Supp. at 96.

---

finish with a better record. The Court finds that under the present circumstances these observations are irrelevant to the determination of whether Silvestre was terminated legitimately under the RIF or whether the RIF was a mere

pretext. Moreover, even if these observations were relevant, the Court finds that they are insufficient as a matter of law to discredit the employer's proffered reason in this case.

■ Lastly, Silvestre also has failed to establish a cause of action under 42 U.S.C. section 1988. This statute authorizes federal courts to look to principles of state common law where federal law is unsuited or insufficient to furnish suitable remedies. *See. e.g., Moor v. County of Alameda,* 411 U.S. 693, 702–03, 93 S.Ct. 1785, 1792–93, 36 L.Ed.2d 596 (1973). Federal law provides substantial remedies for race, national origin, and age discrimination claims. Nevertheless, the Court has considered each of Silvestre's common law based claims. As discussed below, each of Silvestre's common law claims fails. Consequently, the Court must grant summary judgment in favor of the defendants on Silvestre's section 1988 claim as well.

## II. The Court Must Grant Summary Judgment Also On Silvestre's Common Law Claims

### A. Deceit

■ To establish a claim for fraud or deceit, a plaintiff must prove "a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 51, 477 A.2d 1224 (1984); *see also Grow Farms Corp. v. Nat'l State Bank, Elizabeth,* 167 N.J.Super. 102, 107–08, 400 A.2d 535 (Law. Div.1979) (same legal standard applies to claims alleging common law fraud and deceit). A plaintiff can maintain a claim only if the plaintiff can establish a "false state of mind"—that the defendant had no intention to perform a future event or action at the time that the material representation was made. *See Mallon v. Prudential Property and Cas. Ins. Co.,* 688 F.Supp. 997, 1008 (D.N.J.1988); *Capano v. Borough of Stone Harbor,* 530 F.Supp. 1254, 1264 (D.N.J.1982). According to Silvestre, "[t]he defendants as aforesaid engaged in conduct which amounted to outrageous conduct, deceit, and prima facie tort, by deliberately lowering plaintiff's performance ratings and concealing them from him, thereby depriving him of any opportunity to respond, and in using the ratings to terminate plaintiff, thereby causing plaintiff to incur damages." (Complaint ¶ 144.)

Silvestre has failed to establish any of the requisite elements of a deceit claim. He has failed to establish any misrepresentation, falsity, or reliance. Consequently, the Court will dismiss this claim.

### B. Prima Facie Tort

■ The prima facie tort is designed to redress unjustified "intentional, willful or malicious harms" where no adequate common law or statutory remedy exists. *See Mehlman v. Mobil Oil Corp.,* 291 N.J.Super. 98, 137 n. 18, 676 A.2d 1143 (App.Div.1996) (prima facie tort claim brought in connection with plaintiff's alleged wrongful discharge barred by CEPA's waiver provision). Silvestre cannot recover because he has demonstrated no malicious conduct on the part of the defendants. Indeed, it appears from the record that no reasonable jury could discredit the defendants' proffered reason for their discharge of Silvestre—the reduction in force. Consequently, the Court will grant summary judgment in favor of the defendants on Silvestre's prima facie tort claim.

### C. Tortious Interference With Contract

■ Silvestre alleges in the Fifth Count of his Amended Complaint that the defendants tortiously interfered with his alleged employment rights with the Bell Atlantic Corporation. According to Silvestre, "the defendants intentionally and wantonly lowered the plaintiff's performance appraisal ratings, unfairly and without just cause, and withheld plaintiff's appraisal performance ratings from him, and utilized the falsely lowered appraisal ratings to terminate the plaintiff's employment." (Complaint ¶ 49.) Because Silvestre fails to establish the requisite elements of a tortious interference with contract claim, the Court must grant summary judgment on this count as well.

A tortious interference with contract claim can be waged only against a third-party who is not a party to the contractual or economic relationship at issue. *See. e.g., Pitak,* 928 F.Supp. at 1369 ("Because the tort of interference with contractual relations presupposes interference by a non-party to the contract, summary judgment is granted."); *Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 N.J. 739, 752, 563 A.2d 31 (1989) ("it is 'fundamental' to a cause of action for tortious interference ... that the claim be directed against defendants who are not parties to the relationship."). An employee working for the corporation with which the plaintiff allegedly had a contract cannot serve as the third-party necessary for the tripartite relationship, unless the employee acted outside the scope of his employment. *See, e.g., Obendorfer v. Gitano Group, Inc.,* 838 F.Supp. 950, 956 (D.N.J.1993). Because Silvestre alleges that Losch, Williams, and Smith tortiously interfered with his contract, but fails to establish that they acted outside the scope of their employment, the Court must grant summary judgment for the defendants on this count.

### D. Negligent Hiring and Supervision

Silvestre alleges in his Sixth Count that the defendants BAC and BA–NJ negligently supervised and trained its supervisory employees and encouraged Losch and Williams to make racial comments on Silvestre's evaluations to allow Silvestre's termination. (Complaint ¶ 55.)

To establish a claim of negligent hiring and supervision, the plaintiff must present evidence that: (1) the employer knew or had reason to know of the particular unfitness, incompetence, or dangerous attributes of the employee, (2) the employer could reasonably have foreseen that these qualities created a risk of harm to other persons, and

(3) the employer's negligence and the employee's unfitness or dangerous characteristic proximately caused the injury. *See Johnson v. Usdin Louis Co., Inc.,* 248 N.J.Super. 525, 528, 591 A.2d 959 (App.Div.), *certif. denied,* 126 N.J. 386, 599 A.2d 163 (1991).

An employee cannot, however, assert negligent hiring and supervision against an employer. Under Jersey law an action in negligence against an employer is barred by the New Jersey Workers Compensation Act, N.J.S.A. § 34:15–8.[5] *See. e.g., Fregara v. Jet Aviation Bus. Jets,* 764 F.Supp. 940, 954 n. 8 (D.N.J.1991) (dismissing plaintiff's cause of action for "negligent evaluation," and noting that "plaintiff cannot pursue any cause of action based upon negligence due to the exclusive remedy provision set forth in the New Jersey Workers' Compensation Act, N.J.S.A. 34:15–8"); *Wellenheider v. Rader,* 49 N.J. 1, 9, 227 A.2d 329 (1967); *Millison v. E.I. du Pont de Nemours & Co.,* 101 N.J. 161, 165, 501 A.2d 505 (1985) (characterizing N.J.S.A. 34:15–8 as an "exclusive remedy").

Thus, because Silvestre is a former employee suing BAC, his former employer, the Court must grant summary judgment in favor of the defendants on this claim.

### E. Intentional Infliction of Mental and Emotional Distress

In his Seventh Count, Silvestre alleges that the defendants are liable for intentional infliction of mental and emotional distress. The Court disagrees and will grant summary judgment in favor of the defendants on this count as well.

To state a claim for intentional infliction of emotional distress, a plaintiff must establish: (1) intentional and outrageous conduct by the defendant, (2) proximate cause, and (3) severe distress. *See Buckley v. Trenton Saving Fund Soc'y,* 111

---

**5.** This statute provides in pertinent part:

If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

N.J.S.A. § 34:15–8.

N.J. 355, 366, 544 A.2d 857 (1988). The defendant's conduct must be so outrageous in character and extreme in degree that it goes beyond all possible bounds of decency and is to be regarded as "atrocious and utterly intolerable in a civilized community." *See id.* (quoting Restatement(Second) of Torts § 46 Comment (d) (1965)).

Silvestre bases his intentional infliction of emotional distress claim on the circumstances leading to the termination of his employment with BAC. Because Silvestre has failed to allege any extreme or outrageous conduct on the part of the defendants and because Silvestre's deposition testimony reveals that he has not suffered any severe emotional distress (Defs. 12G ¶ 38 (plaintiff claims only to suffer from occasional difficulty sleeping and depression)), the Court must grant summary judgment in favor of the defendants on this count.

### III. ERISA

■ In his Eighth Count, Silvestre alleges that the defendants violated his rights under 29 U.S.C. section 1132(a)(3) and 1140 ("ERISA § 510").

ERISA § 510 entitles a beneficiary or a participant in an ERISA-approved plan to bring an action to recover benefits or to enforce ERISA-provided rights. *See Pitak,* 928 F.Supp. at 1372. ERISA § 510 provides that it is unlawful for an employer to discharge a participant in any employee benefit plan for "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1132(a)(3). To establish a *prima facie* case under ERISA § 510, the employee must demonstrate that: (1) the employer engaged in prohibited conduct, and (2) the employer intended to interfere with any right to which the employee may become entitled. *See Gavalik v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

By its terms, this section "protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting." *Ingersoll–Rand v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). One essential element of proof, thus, is the employer's specific intent to engage in the proscribed activity. *Gavalik,* 812 F.2d at 851. Additionally, an employee cannot establish a cause of action under ERISA § 510 by alleging that the employee merely would have accrued more benefits in the future had the employee remained employed. *See id.* at 852 ("Proof of incidental loss of benefits as a result of termination will not constitute a violation of § 510"); *see also West v. Greyhound Corp.,* 813 F.2d 951 (9th Cir.1987) ("[A]n employee has no right to future, unaccrued benefits . . .").

In this case, Silvestre fails to establish a cause of action under these ERISA provisions for two reasons. First, Silvestre's pension and retirement benefits had already vested at the time of his termination, and he has lost no vested pension or retirement benefits as a result of his termination. Silvestre's claim that his pension would have been larger had he not been terminated is not cognizable under these ERISA provisions. *See Pitak,* 928 F.Supp. at 1372. Second, Silvestre cannot establish an ERISA violation because he has no direct or circumstantial evidence that the defendants terminated him with the specific intent of interfering with his employment entitlement. Consequently, Silvestre has failed to establish a *prima facie* case under ERISA § 510, and the Court must grant summary judgment in favor of the defendants.

### CONCLUSION

For the reasons stated herein, the Court will grant summary judgment in favor of the defendants on Silvestre's claims for race, national origin, and age discrimination; for violation of 42 U.S.C. sections 1985(3), 1986, and 1988; for deceit, tortious interference with contract, negligent hiring and supervision, intentional infliction of mental and emotional distress, and the prima facie tort; and for violation of 29 U.S.C. sections 1132(a)(3) and

1140. Having resolved these claims in favor of the defendants the Court need not address the issues whether punitive damages would be appropriate or whether claims are properly asserted against Raymond Smith individually.

An appropriate Order is attached.

### ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 15th day of July, 1997

ORDERED that defendants' motion for summary judgment on plaintiff Manuel Silvestre's race, national origin, and age discrimination claims is granted; and it is further

ORDERED that defendants' motion for summary judgment on Silvestre's 42 U.S.C. §§ 1985(3), 1986, and 1988 claims is granted; and it is further

ORDERED that defendant's motion for summary judgment on Silvestre's causes of action for deceit, tortious interference with contract, negligent hiring and supervision, intentional infliction of mental and emotional distress, and prima facie tort causes of action is granted; and it is further

ORDERED that defendants' motion for summary judgment on Silvestre's 29 U.S.C. §§ 1132(a)(3) and 1140 claims is granted.